UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

PEGGY SUE SIMPSON,

                    Plaintiff,              Case No.: 11-13366
                                            Honorable Denise Page Hood
          v.                                Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                    Defendant.
_____/

REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [10, 13]

Plaintiff Peggy Simpson brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

I.      RECOMMENDATION

For the reasons set forth below, the court finds that the ALJ's residual functional capacity ("RFC") assessment was not supported by substantial evidence in part because the ALJ gave insufficient weight to the opinions of one of Simpson's treating physicians in light of the evidence in the record. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [13] be DENIED, Simpson's motion [10] be GRANTED IN PART AND DENIED IN PART and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be REVERSED AND REMANDED back to the ALJ for further

proceedings consistent with this Report and Recommendation.

## II.  REPORT

### A.  Procedural History

On March 13, 2009, Simpson filed an application for DIB, alleging disability as of October 4, 2008.  (Tr. 117-18).  The claim was denied initially by the state agency on August 5, 2009.  (Tr. 47).  Thereafter, Simpson filed a timely request for an administrative hearing, which was held on June 1, 2010, before ALJ Paul Armstrong.  (Tr. 13-46).  Simpson testified, represented by an attorney, as did vocational expert ("VE") Jennifer Teracki.  (*Id.*).  On June 16, 2010, the ALJ found Simpson not disabled.  (Tr. 48-63).  Simpson appealed, forwarding a number of additional records to the Appeals Council.  (Tr. 1-7).  On July 15, 2011, the Appeals Council denied review.  (*Id.*).  Simpson filed for judicial review of the final decision on August 2, 2012 [1].

### B.  Background

#### 1.  *Disability Reports*

In a disability report dated March 23, 2009, Simpson reported that the condition limiting her ability to work was "herniated discs[,] surgery related to the herniation."  (Tr. 139).  She reported that this condition prevented her from working as she could not lift, bend, be in one position for any period of time (her legs would go numb) and that she had broken her foot as a result of her condition.  (*Id.*).  She reported seeing a number of treating doctors for her condition, resulting in a number of tests and several injections.  (Tr. 141-44).  She reported that her medications included Rioeaxin and Vicodin for muscle relaxation and pain, Tramadol for pain, and Celexa and Atavan for anxiety.

In a function report dated April 4, 2009, Simpson reported that she lives in a house with

her family.  (Tr. 155).  Her day consists of waking her handicapped daughter up and getting her off to school, (including bathing and dressing her, preparing her meals and walking her to the bus), and then, depending on the day she is having, either doing the dishes, or taking her medication and lying down.  (Tr. 155-56).  She reported that her day consists mostly of relaxing because she cannot stand for a long period of time and the best position in which to relieve her pain is on her stomach.   (Tr. 155).   Simpson reported that her husband takes care of the household, including grocery shopping, cleaning, paying bills, helping to care for her daughter and care for Simpson as well.  (Tr. 156).  She reported that the things she could do before that she cannot do now include "almost everything except my personal care."  (*Id.*).  Her condition also wakes her up at night if she moves to a different position.  (*Id.*).

Simpson reported that she could, depending on the day, cook frozen meals, sandwiches or soup, and occasionally "throw a roast in the crockpot."  (Tr. 157).  She cannot do any yard work, and she can only do dishes and make the bed "every other day if I am having a good day."  (*Id.*).  She reported that she went outside every day, and was able to drive a car only "short distances" because her feet go numb and she cannot sit for a period of time.  (Tr. 158).  She reported shopping for little items approximately twice a week for a couple of hours at a time.  (*Id.*).  Simpson reported that her hobbies had included walking her daughter in her wheelchair, watching movies and playing horseshoes, although in her present condition she cannot walk her daughter or play horseshoes as they are both "very hard on [her] back." (Tr. 159).

Simpson reported that her condition interferes with her ability to lift, squat, bend, stand, reach, walk, sit, kneel and stair climb.  (Tr. 160).  She reported she can only lift five pounds, that squatting and bending send sharp pains in her legs and back, that she can stand 30 minutes and sit for the same amount of time and walk roughly ½ mile on a good day, but only to her mailbox

3

on a bad day.  (*Id.*).  After that she has to lie down.  (*Id.*).  Reaching and stair climbing have to be "very slow."  (*Id.*).  She reported that she has been prescribed a cane, and would also be prescribed a back brace after her impending back surgery.  (Tr. 161).  In the comments section, Simpson reported that her husband "takes care of everything with [her] daughter and all household duties."  (Tr. 162).

In a disability appeals reported dated September 17, 2009, Simpson reported that she had back surgery on April 22, 2009, but that the surgery had not worked and she continues to have pain on a constant basis even with medication.  (Tr. 166).  She reported she is very limited in her activities – she can only lift 5-10 pounds and needs assistance in the kitchen to prepare small meals.  (*Id.*).  She reported that since her surgery she has difficulty putting on socks and pants or do much of anything due to constant pain, and that she could only drive or sit in a car for 30 minutes at a time.  (Tr. 170).  She reported additional medications, including Brobaxin for muscle relaxation, Amrix and Lyrica for nerve blocking and Atenol for high blood pressure.  (Tr. 169).

### 2.    *Plaintiff's Testimony*

At the hearing, Simpson testified that her condition began when she slipped and fell at work, landing on her back.  (Tr. 20).  After some treatment, Simpson ultimately ended up having surgery, specifically a cage fusion, a laminectomy and a fusion of her spine at L4-L5.  (*Id.*).  She had also had subsequent surgeries to implant a temporary stimulator and then a permanent stimulator into her back to relieve her pain, with periodic lead adjustments.  (Tr. 20-21).

Simpson testified that she lives at home with her husband of two years and her two children, aged 16 and 22.  (Tr. 21-22).  She testified that she can drive short distances, shop at the grocery store on a good day and cook periodically.  (Tr. 22).  She can also do a load or two of

laundry a week, if she is having good days, with the laundry located in the basement of her house. (Tr. 21; 23; 38). She testified that she has approximately 10 good days a month with the rest being bad days where she can only get up from bed and lie down on the couch with a pillow under her stomach. (Tr. 38).

Simpson testified that she walks with a cane, prescribed by her doctor, as a guide for balance because her right foot goes numb from her back problems. (Tr. 23; 27). She also testified that she wears a back brace daily. (Tr. 35-36). She testified that with her cane she can walk around her house pretty well, and could walk at the store until it starts to hurt, which is approximately one-half hour. (Tr. 28-29). She testified she can sit for a half hour to 45 minutes, depending on the day, and that she cannot lift more than 5 pounds. (Tr. 31-32). Alternating sitting and standing relieves the pain "for a little bit," but her best position is lying on her stomach. (Tr. 32-33). She cannot lie on her back because the pain is too severe. She finds it necessary to lie down four to five times a day for between 45 minutes and an hour. (Tr. 37).

Simpson testified that her pain consists of sharp shooting back pain radiating to her buttocks and her right leg, causing her right foot to go numb. (Tr. 29). She testified that on a scale of 1 to 10 her pain is generally an 8, and is reduced to a 7 with medication. (Tr. 36). She had been treated with morphine, but it made her sick so she was placed on Dilaudid instead, which works for approximately two hours at a time. (Tr. 33; 36). She testified that she had underwent physical therapy before her first surgery, and then again afterwards, but that the therapy afterwards was terminated after only two weeks because there was too much swelling and her therapists believed that something more was wrong. (Tr. 27). She had not resumed physical therapy due to recurring problems with the implantation of her stimulator. (Tr. 30). She testified that she had undergone one EMG study that was negative. (Tr. 28).

5

### 3.    Medical Evidence

Simpson's brief relies intensively on the medical records that were submitted to the Appeals Council but were never before the ALJ. Yet, she does not argue, nor does this court believe she could, that these records constitute new and material evidence such that this case should be remanded back to the ALJ for their consideration.[1] Therefore, the court will only consider only the records that were properly before the ALJ.

### a.    Treating Sources

On October 4, 2008, Simpson presented to the emergency room after a fall at work where she slipped and landed on her back. (Tr. 184). She reported lower back pain subsequent to the fall that occasionally shot down her left leg into her ankle. (*Id.*). An x-ray previous taken at a workers' compensation clinic had appeared to show a transverse process fracture at L4. (*Id.*). However, an x-ray taken at the hospital showed no such fracture, just some degenerative joint

---

[1] In order for a case to be remanded back to the ALJ for the consideration of new evidence, the evidence must be material, and good cause must be shown as to why it was not presented at the prior proceeding. 42 U.S.C. § 405(g); *Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (6th Cir. 1984). "Good cause" requires the claimant to demonstrate "a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2002). The Sixth Circuit has held that for new evidence to be material there must be "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 712 (6th Cir. 1988).

Here, even assuming that the medical records are material to Simpson's claim, she has not made any arguments that there was good cause for their omission before the ALJ, especially here, where the ALJ left open the record for supplementation. (Tr. 46). Failure to argue, let alone satisfy, the good cause standard is sufficient to prevent the remand of a case under this rule for consideration of new evidence. *See Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (6th Cir. 1984) (finding that failure to satisfy "good cause" requirement prevents court from remanding case even if new evidence is deemed material); *see also Robinson v. Sec'y of Health & Human Servs.*, No. 90-2304, 1991 U.S. App. LEXIS 10743 at *6 (6th Cir. May 15, 1991) (same); *Brown v. Comm'r of Soc. Sec.*, No. 10-12960, 2011 U.S. Dist. LEXIS 136050 at *11-12 (E.D. Mich. Nov. 28, 2011) (evidence that is new and material nevertheless does not warrant remand where good cause is not established).

disease. (Tr. 185). A CT scan taken of her lumbar spine also showed no evidence of fracture of subluxation. (Tr. 186). Upon examination, Simpson displayed some lumbar and paraspinal tenderness, but had good range of motion and strength across her hips and knees. (Tr. 185). Her sensation, pulses and reflexes were intact. (*Id.*).

At an October 6, 2008, appointment with her primary physician, Dr. Amin Badawi, Simpson reported her fall and subsequent back pain, rating it a 10 of 10 on a pain scale. (Tr. 325; 439). She denied numbness or weakness in her legs, but noted that the pain radiated to her left leg and was aggravated by sitting, standing or walking. (*Id.*). Upon examination, Dr. Badawi noted lumbar tenderness, more on the left side, and a positive straight leg raising test bilaterally. (*Id.*). She noted that x-rays had conflicted as to whether there was a fracture, ordered an MRI, and prescribed Vicodin and Naproxin. (*Id.*).

An MRI taken of Simpson's lumbar spine three days later, on October 7, 2008, showed an "L4-L5 posterior circumferential bulging of the annulus fibrosus with radial tear and superimposed posterior central small disc protrusion/herniation [which] moderately deforms the ventral thecal sack and mildly-moderately narrows the spinal canal." (Tr. 236). It also showed L4-L5 degenerative disc disease/desiccation. (*Id.*).

At an October 19, 2008, appointment with Dr. Badawi, Simpson reported continued pain radiating into her left leg and that she had fallen two to three times at home due to a feeling that her left leg was "heavy" and "not carrying her body." (Tr. 326). Upon examination, Dr. Badawi noted tenderness on lower lumbar spine and a positive straight leg raising test bilaterally at 30 degrees. (*Id.*). She referred Simpson to a neurosurgeon for a consultation. (*Id.*).

On October 23, 2008, Simpson was treated by Dr. Steven Rapp, a neurological surgeon, at the Spine Institute. (Tr. 277-80). She reported severe low back pain that occasionally radiated

7

into her legs and thighs, more on her left than right. (Tr. 277). She rated her pain as an 8 or 9 out of 10 and believed she had some associated weakness in her left leg, which led to several falls. (*Id.*). She reported being able to sit five minutes and stand 30 minutes. (*Id.*). Upon examination, Simpson exhibited significant pain with muscle testing at her hips and knees, and extension and flexion of both knees caused significant back pain. (Tr. 278). She had a decreased range of motion in her lumbar spine and did appear to have some left leg weakness, but Dr. Rapp opined this was more likely related to pain than actual muscle weakness. (Tr. 279). Simpson had a slightly positive straight leg raising test on her left, but was otherwise ambulating with a fairly normal gait. (*Id.*). She was diagnosed with lumbar disk herniation with mild stenosis and an initial conservative course of treatment was recommended, which included epidural steroid injections and physical therapy. (Tr. 279-80). On the same day, Dr. Rapp issued an off-work slip for Simpson stating that she would be off work until her physical therapy was completed and then would be reevaluated at that time. (Tr. 273).

Simpson began a course of physical therapy on October 29, 2008, that continued through January 2009. (Tr. 188-235). At her initial consultation with Dr. Katherine Karo, Simpson reported low back pain that radiated to her right leg 25% of the time and to her left leg 50% of the time. (Tr. 230). Her back pain averaged 8 out of 10, her right leg 2 out of 10 and her left leg 8 out of 10. (*Id.*). Her pain was aggravated by activities, including prolonged sitting, standing, walking, lying down, and repetitive bending and lifting. (Tr. 230-31). She reported being able to sit for only 10 minutes and stand for the same amount of time. (Tr. 231). She could not walk at all without increasing the pain. (*Id.*). She could sleep for approximately 4-6 hours. (*Id.*). She had to change the way she cared for her person due to her pain, could only lift very light weights, and could only go out for 30 minutes at a time. (*Id.*).

Upon examination, the doctor noted that Simpson was sitting comfortably and could transfer between sitting and standing "with ease." (Tr. 232). There was a normal lumbar lordosis, although Simpson had uneven shoulders and hips. (*Id.*). There was pain with palpation over her lower spine, but no area of maximum tenderness. (*Id.*). She was able to stand erect. (*Id.*). Her gait pattern was not tested due to a cast on her foot. (*Id.*). Her range of motion was decreased in all areas and occurred with pain. (*Id.*). Simpson could squat, with difficulty. (*Id.*). Sitting straight leg raising tests bilaterally were limited to 90 degrees with pain, supine tests were limited to 60 degrees with pain. (Tr. 233). She was diagnosed with low back pain, lumbar radiculitis, herniated nucleus pulosus, degenerative disc disease, mechanical low back pain, degenerative arthritis of the spine and an L4-L5 radial tear. (*Id.*). Her prognosis was good. (Tr. 234).

On November 17, 2008, Simpson underwent an epidural steroid injection at L4-L5. (Tr. 291-92). A second injection scheduled for December 1, 2008, was cancelled because she reported that her lower back pain and leg numbness had worsened after the first injection. (Tr. 293). The second injection was completed on December 4, 2008. (Tr. 298-99). A third injection was administered on December 18, 2008. (Tr. 300-301).

In a December 2, 2008, status report, Simpson's physical therapist ("PT"), Lovely Simon, reported to Dr. Rapp that after eight visits, her lower back pain and left leg pain had improved and that she no longer had right leg pain. (Tr. 221). She denied any weakness and reported that her numbness had also improved. (*Id.*). Her ability to function had improved as well. (*Id.*). She could care for her person without altering her routine, she could sit and stand for ½ hour each, and she could more often go out in public. (*Id.*). However, Simpson reported that her pain was neither getting better nor worse. (*Id.*). Upon examination, Simpson's shoulders and hips

9

remained uneven, higher on the right. (Tr. 222). There was tenderness to palpation over her left posterior superior iliac spine and left sacroiliac joint, which was also where her maximum tenderness was. (*Id.*). She was able to stand erect, and her gait was irregular due to a cast on her foot. (*Id.*). Her range of motion was improved, but still below normal and with pain. (*Id.*). Simpson was able to transfer from standing to sitting, and sitting to supine, but with difficulty. (*Id.*). Her thigh and calf circumferences were symmetrical, her right straight leg raising test was limited to 65 degrees with pain, and her left to 60 degrees with pain. (Tr. 222-23). Positive axial compression was noted. (Tr. 223). PT Simon concluded that Simpson was progressing slowly and that her prognosis was "fair." (*Id.*).

On the same day, Simpson was examined by Dr. Rapp. (Tr. 281). He noted "minimal paraspinous muscle spasm with relatively good range of motion of the lumbosacral spine" and a negative straight leg raising test. (*Id.*). Simpson's power and muscle tone were within normal limits. (*Id.*). Dr. Rapp noted that a sensory exam revealed "an inappropriate finding of decreased sensation to pinprick along the L4-L5 and L5-S1 deratome" which he concluded was the result of some embellishment on Simpson's part. (*Id.*). Dr. Rapp concluded he was hopeful to return Simpson to work in a month. (*Id.*). Dr. Rapp issued Simpson another off-work note stating that her ability to work would be evaluated at her next appointment on January 8, 2009. (Tr. 274).

On December 3, 2008, Simpson was seen by her primary physician Dr. Amin. (Tr. 334). She reported moderately severe back pain radiating to her left leg with numbness in her toes. (*Id.*). Upon examination, Dr. Amin noted tenderness in Simpson's lower lumbar region and a positive straight leg raising test on the left at 40 degrees. (*Id.*). Her impression was back pain and disc disease and recommended a follow-up with Dr. Rapp. (*Id.*).

10

In another physical therapy follow-up report dated December 30, 2008, PT Simon again reported some improvement in Simpson's condition. (Tr. 212). Simpson reported that her back pain was the same only about 25% of the time, and her left leg pain was a 3-5 out of 10. (*Id.*). She reported feeling stronger as well. (*Id.*). Simpson reported that she could now lift conveniently placed medium weights, walk ½ mile, and sit for one hour. (*Id.*). Simpson repeated that her pain was neither getting better nor worse. (*Id.*). Upon examination, it was noted that Simpson's pelvis and shoulders were level, there were no complaints of pain upon palpation, she was able to stand erect, although her gait was limping. (Tr. 213). Her range of motion was improved, although still below normal. (*Id.*). However, she exhibited no pain on left rotation or left side bending. (*Id.*). An axial compression test was positive, and Simpson was able to toe- and heel-walk but only with pain. (*Id.*). She was able to transfer from standing to sitting and sitting to supine with difficulty and complaints of pain. (Tr. 213-14). Sensation to her left leg was diminished in the plantar area of her left foot. (Tr. 213). Her thigh and calf circumferences were symmetrical. (*Id.*). A Patrick test was painful on the left with low back pain. (*Id.*). A straight leg raising test on the right was restricted to 40 degrees with pain, and to 45 degrees on the left with pain. (Tr. 213-14). PT Simon again concluded that Simpson was progressing slowly and her prognosis was fair. (Tr. 214).

While there are no more status reports after this date, Simpson attended physical therapy at least twice more, on January 6, 2009, and again on January 8, 2009. (Tr. 189; 191). At both appointments she reported lower back pain and a loss of sensation and aching in her right leg, with a pain level of 7-8. (*Id.*). She reported that her right toes would go numb with prolonged sitting and standing. (Tr. 190). On January 8, she also reported shooting pain and soreness, and pain in her left leg as well. (Tr. 189).

On that same date, Dr. Rapp examined Simpson. (Tr. 282). He found that she had not improved with physical therapy or epidural injections and that she reported feeling as though she was getting worse. (*Id.*). A review of MRI films revealed "a degenerated disk at L4-L5 with disk bulge and bilateral foraminal encroachment." (*Id.*). Dr. Rapp recommended a discogram and, if the result was positive, an anterior lumbar interbody fusion. (*Id.*). He issued Simpson another off-work note, recommending that she remain off-work until the discogram could be completed and she could be reevaluated. (Tr. 275). He did not give a specific date. (*Id.*).

At an appointment with Dr. Amin on February 4, 2009, Simpson reported that her back pain was not responding to the epidural injections. (Tr. 336). Upon examination, Dr. Amin found tenderness in Simpson's lower lumbar region. (*Id.*). A discogram was conducted by surgeon James Honet on February 5, 2009. (Tr. 457-74). Prior to surgery, upon examination, Dr. Honet noted that Simpson's gait was normal, that she had pain in her back upon extension, but no pain with side bending, rotation or flexion. (Tr. 472). She had a positive straight leg raising test on the left, but negative on the right. (*Id.*). Her senses were all intact. (*Id.*).

On March 3, 2009, Dr. Rapp reviewed the results of the discogram with Simpson, which revealed "evidence of abnormal morphology to the L4 disk with concordant pain." (Tr. 283; 306-311). A CT scan revealed "disk herniation with spinal stenosis." (*Id.*). He recommended an interbody fusion at L4-L5 and Simpson agreed to the surgery. (*Id.*). Dr. Rapp issued another off-work note for Simpson, concluding that she could return to work June 3, 2009. (Tr. 276).

At an April 2, 2009, appointment with Dr. Badawi, Simpson reported continued lower back pain radiating into both legs with numbness in her right leg. (Tr. 337). She reported that she was going to be having surgery in two weeks. (*Id.*). Upon examination, Dr. Amin noted tenderness in Simpson's lower lumbar region. (*Id.*).

A successful extreme lateral interbody fusion at L4-L5 was performed on April 22, 2012. (Tr. 340-408).  At a follow-up on May 6, 2009, Simpson reported doing well, with only low achy back pain and no leg pain or numbness.   (Tr. 433).   It was determined that she was neurologically stable.  (*Id.*).  A CT scan of Simpson's lumbar spine on June 4, 2009, showed stable post-operative changes at L4-L5.  (Tr. 436-37).

Simpson began another course of physical therapy after surgery.  While the notes are not fully legible and are not all in the file, it appears that, at an appointment on June 29, 2009, tenderness and warmth was noted on her lumbar spine and a straight leg raising test was positive on the right.  (Tr. 434).  She complained of pain of 8 on a scale of 1-10, and that she needed to have help to care for her daughter.  (*Id.*).  She reported only being able to stand 1 hour and sit for 15 minutes at a time.  (*Id.*).  The PT felt that her rehab potential was good.  (*Id.*).  At an appointment on July 30, 2009, Simpson reported having been unable to keep appointments because she had been in the hospital with her daughter and her pain had increased from having to sleep in hospital chairs.  (Tr. 432).  The PT noted that her range of motion in her lumbar spine was restricted by 75% on all planes.  (*Id.*).  At an appointment on August 28, 2009, the PT noted that Simpson had now completed 12 sessions.  (Tr. 431).  Simpson reported pain of 8-9 out of 10 in her lumbar area with pain in the left greater than the right.  (*Id.*).  She also reported moderate bilateral lumbosacral spasms.  (*Id.*).  Her range of motion in that area was 50% restricted in all planes.  (*Id.*).  A discharge note authored on October 1, 2009, noted that upon completion, Simpson still maintained pain of 8-9 out of 10, moderate bilateral lumbar spasms and warmth, and that her range of motion was still 50% restricted.  (Tr. 430).  The PT concluded that her goals were "partially met" and that her progress had been limited due to her sleeping in hospital chairs while caring for her disabled daughter.  (*Id.*).

13

At an August 10, 2009, appointment with Dr. Badawi, Simpson continued to report constant back pain radiating to her right leg with numbness in her right toes. She also had nocturnal pain. Upon examination, Dr. Badawi noted tenderness in Simpson's middle lumbar region. At a September 10, 2009, appointment with Dr. Rapp, he noted that Simpson continued to have back and occasional leg pain despite the fact that there was no focal, motor or sensory deficits. He concluded that she was a "failed lumbar fusion" who was "not responding to muscle relaxers or to analgesics" and who had "failed physical therapy" and "epidural steroid injections." He recommended implantation of a trial dorsal column stimulator. (Tr. 429). On October 2, 2009, Dr. Rapp wrote Simpson an off-work note for one week. (Tr. 427). On the same day, he wrote another off-work note stating that Simpson was unable to work "in any capacity" at this time because surgery was being discussed. (Tr. 426). There was no return to work date specified in this note. (*Id.*).

On October 10, 2009, Simpson underwent surgery to have a trial dorsal column stimulator implanted in her back. (Tr. 477). Dr. Rapp performed the procedure, and noted that her diagnoses were "complex regional pain syndrome" and "failed back syndrome." (*Id.*).[2]

In an October 16, 2009, letter "To Whom It May Concern," Dr. Rapp stated that Simpson's pain had not responded to initial conservative treatment and after undergoing a discogram, fusion was recommended, which was performed on April 22, 2009. (Tr. 321). Dr. Rapp stated that Simpson has made small and steady improvement since that time, however, despite postoperative physical therapy, "her symptoms continue to remain significant and often incapacitating." (*Id.*). He noted he had recently recommended implanting "a dorsal column stimulator to address her residual symptoms." (*Id.*). He opined that he believed Simpson would

---

[2] A CT scan dated October 5, 2009, revealed placement of the stimulator in Simpson's back, however, as the surgery had been performed on October 10, 2009, the court believes the date of this report must be a mistake. (Tr. 428). Regardless, the CT scan also noted that alignment of Simpson's hardware appeared to be satisfactory. (*Id.*).

14

be unable to return to her former job due to continued "significant limitations with lifting, pushing or pulling and has exacerbation of pain with prolonged sitting or standing." (*Id.*). He recommended "permanent disability." (*Id.*).

On November 11, 2009, Simpson was seen by Dr. Nadine Jennings for pain management upon the recommendation of Dr. Rapp. (Tr. 455-56; 425). Simpson reported continued pain post-surgery, after an initial period of decreased pain. (Tr. 455). She reported that her pain was in her lower back area and buttocks, as well as her right leg and foot. (*Id.*). Upon examination, Dr. Jennings noted pain upon palpation of the lower lumbar area, sacrum and right scaphotrapezial ("ST") joint. (Tr. 456). Simpson's range of motion was limited to 40 degrees of flexion, 20 degrees of extension and 40 degrees of lateral rotation. (*Id.*). A straight leg raising test was positive on the right side. (*Id.*). Sensation was also diminished over the dorsal and lateral aspect of Simpson's right foot. (*Id.*). However, muscle strength was good in both legs, there was a full range of motion in both hips and a Patrick maneuver was negative. (*Id.*). Dr. Jennings recommended an EMG of Simpson's right leg, a physical therapy program, and started her on Dilaudid, Zanaflex and Neurontin. (*Id.*). An EMG of Simpson's right leg conducted on December 1, 2009, was negative. (Tr. 449-50; 440).

At a follow-up appointment with Dr. Jennings on December 29, 2009, Simpson reported noting better pain relief with the Dilaudid and Zanaflex, but did not notice any improvement with the Neurontin. (Tr. 440-41). She had not attended physical therapy for two weeks due to an upper respiratory infection. (*Id.*). Upon examination, Dr. Jennings noted no paraspinous spasm of the lumbar spine, but a continued restricted range of motion. Motor strength and gait were both normal. (*Id.*).

On January 4, 2010, Simpson underwent surgery for the implantation of a dorsal column

stimulator, which was successful. (Tr. 423-24). At a post-operative appointment with Dr. Rapp on January 18, 2010, Simpson reported being pleased with her progress and noted that her pain was "getting slightly better." (Tr. 422). Initial programming of the device met with "moderate success." (*Id.*). Dr. Rapp opined that at this time Simpson was "neurologically stable," and that he would see her back "on an as needed basis for continuing reprogramming." (*Id.*).

At a February 3, 2010 appointment with Dr. Jennings, Simpson reported increased lower back pain since implantation of the spinal cord stimulator in January. (Tr. 442). She reported that multiple attempts to program the unit had failed. (*Id.*). She reported using a cane for ambulation because of loss of balance at times. (*Id.*). She had experienced no improvement with the Neurontin. (*Id.*). Upon examination, Dr. Jennings noted hyperesthesia over the left buttocks in the area of the stimulator generator, continued restricted range of motion in the lumbar spine, but full motor strength in both legs. (*Id.*). Dr. Jennings increased Simpson's Neurontin dose and concluded that pain relief would come upon proper placement and programming of the stimulator. (*Id.*).

At a February 25, 2010, appointment with Dr. Jennings, Simpson reported continuing to do poorly with her pain, and that the pain was exacerbated by "any activity," which was beginning to cause her some depression. (Tr. 443). She reported taking the Dilaudid five times a day which only helped for a few hours. (*Id.*). Upon exam, Dr. Jennings noted sensitivity in the area of the generator, limited range of motion, but no motor weakness. (*Id.*). She placed Simpson on a trial of Embeca to replace the Dilaudid. (*Id.*).

On March 12, 2010, Simpson again underwent surgery to replace a failed dorsal column stimulation lead. (Tr. 475-76; 418). At a March 25, 2010, follow-up with Dr. Rapp, Simpson noted receiving stimulation to both lower extremities, but not completely down to her foot. (Tr.

16

416).  Dr. Rapp noted that a programmer from the hospital was working on this.  (*Id.*).

On the same day at an appointment with Dr. Jennings, Simpson reported doing better since her last visit, due to extended release morphine, although it only lasts about eight hours. (Tr. 444).  Her stimulator had not been able to be reprogrammed yet due to an infection at the implantation site.  (*Id.*).  Upon examination, Dr. Jennings noted no increased warmth of erythema over the generator site, and strength was normal in both legs.  (*Id.*).  In addition, a seated straight leg raising test was negative.  (*Id.*).  Dr. Jennings increase Simpson's morphine and added Ambien to help her sleep.  (*Id.*).

At an April 22, 2010, appointment with Dr. Jennings, Simpson reported continued low back pain with aching discomfort radiating down her right leg and numbness in her right foot. (Tr. 445).  Despite the morphine, she remained limited in her activity tolerance.  (*Id.*).  She also was not getting good coverage with her stimulator despite multiple attempts at programming. (*Id.*).  She reported having gained weight due to inactivity and had "just started walking."  (*Id.*). Upon examination, Dr. Jennings noted that Simpson was wearing a back brace.  (*Id.*).  She noted some sensitivity over the generator site, but that motor strength and gait were normal and a straight leg raising test was negative.  (*Id.*).  At a follow-up on May 19, 2010, Simpson continued to report no changes in her condition.  (Tr. 446).  Her stimulator was not able to be programmed, and the leads had moved again, which would require surgery for removal and implantation of another unit.  (*Id.*).  She reported nausea on the morphine and that she was trying to walk and cut down on smoking.  (*Id.*).  Upon examination, Dr. Jennings noted a normal gait, but did not document any other aspect of Simpson's physical condition as it related to her back or leg pain. (*Id.*).  Dr. Jennings discontinued the morphine, replaced it with Dilaudid, added Flexeril, and recommended cognitive therapy for Simpson's depression.  (*Id.*).

### b.      Consultative and Non-Examining Sources

On August 5, 2009, non-physician disability examiner Julie Bunch assessed Simpson's RFC for the State of Michigan based on an examination of the records to date.  (Tr. 313-20).  She found Simpson capable of lifting 20 pounds occasionally and 10 frequently, standing and walking 6 hours in an 8-hour day and sitting for the same amount of time, and unlimited in her ability to push and pull.  (Tr. 314).  She found Simpson could climb stairs, stoop, kneel and crouch occasionally and balance frequently, but could never climb ropes or ladders or crawl. (Tr. 315).  There were no manipulative, visual, communication or environmental limitations noted.  (Tr. 316-17).  Her limitations were based on records showing a lumbar disc herniation with mild stenosis, with no atrophy, no sensory abnormalities, a slightly positive straight leg raising test, and a fairly normal gait upon ambulating.  (Tr. 314-15).

### 4.      Vocational Expert's Testimony

The VE testified at the hearing that Simpson's prior relevant work as a painter was skilled and medium and as a clerical clerk was semi-skilled a light and that there were no transferrable skills to sedentary work.  (Tr. 40-41).  The ALJ asked the VE to assume a hypothetical claimant of Simpson's age, education level, and vocational background who was limited to simple unskilled light work.  (Tr. 42).  He then asked if such a claimant would be able to return to Simpson's past relevant work.  (*Id.*).  The VE testified that she would not.  (*Id.*).  The ALJ then asked if there was other work in the regional economy that such a claimant could perform.  (*Id.*).  The VE responded that such jobs were available, including hand packer (6,500 positions), sorter (4,000 positions), machine tender (6,000 positions) and inspection checker (3,000 positions).  (*Id.*).

The ALJ then limited the hypothetical claimant to sedentary work, lifting no more than

five pounds with a sit and stand option. (*Id.*). The VE testified that jobs existed in the regional economy for such a claimant, including information clerk (1,000 positions), surveillance system monitor (1,500 positions) and plastic sorter (1,500 positions). (*Id.*). The ALJ then added a limitation that the hypothetical claimant needed to lie down at irregular intervals during the workday, in addition to lunch and breaks. (*Id.*). The VE testified that this would eliminate all jobs. (Tr. 43). The ALJ then modified the hypothetical to state that the claimant needed to lie down only during lunch breaks, but that she also had bad days in which she would miss more than two days of work a month. (*Id.*). The VE testified this also would preclude all gainful activity. (*Id.*). The ALJ again modified the hypothetical to state that the claimant would only miss one day of work a month, but that she may have difficulty concentrating even on unskilled work and would be off-task for an average of 15 minutes of every hour. (tr. 43-44). The VE testified this would preclude all jobs. (Tr. 44).

Simpson's attorney asked the VE that, of the jobs in the light category, if the hypothetical claimant could only use one hand because of the need to use a cane in the other, would that affect the availability of those jobs. (Tr. 45)The VE testified that the jobs of handpacker and sorter would be unavailable under such circumstances, but that the machine tender or inspector jobs would not be affected. (*Id.*).

After the hearing, the ALJ left the record open so that Simpson's counsel could supplement with medical evidence that he had had a hard time obtaining up until the point of the hearing. (Tr. 46).

### C.       Framework for Disability Determinations

Under the Act, DIB is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the

19

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

D.      The ALJ's Findings

Following the five-step sequential analysis, the ALJ found Simpson not disabled.  At

20

Step One he found that she had not engaged in substantial gainful activity since her alleged onset date.   (Tr. 53).   At Step Two, he found that Simpson suffered from the following severe impairment: "degenerative disc disease of the lumbar spine, status post L4-L5 interbody fusion." (*Id.*).   At Step Three, the ALJ determined that her impairment did not meet or medically equal a listed impairment, considering the criteria necessary for meeting listing 1.04 (disorders of the spine).   (Tr. 53-54).   The ALJ next determined Simpson's residual functional capacity, ("RFC"). He found her capable of performing "sedentary work . . . except that the claimant requires the opportunity to alternate between sitting and standing positions throughout the workday.   The claimant, moreover, is incapable of work requiring lifting and carrying of more than five pounds."   (Tr. 54).   At Step Four, the ALJ found Simpson incapable of returning to her past relevant work.   (Tr. 58).   At Step Five, he found that, based on her RFC assessment and the testimony of the VE, Simpson was able to perform a significant number of jobs in the economy. (Tr. 58-59).   Thus, she was not disabled.   (*Id.*).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).   Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."   *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal

quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

###### F.       Analysis

Simpson argues that the ALJ failed to afford proper weight to her treating physician Dr. Rapp's opinions of her physical condition.   In addition, she argues that the ALJ's credibility determination is not supported by substantial evidence.

######   1.       Dr. Rapp's Opinions

The ALJ considered two of Dr. Rapp's opinions, both authored in October 2009.   One, dated October 16, 2009, was a letter detailing Simpson's medical history up until that point, including her fall, subsequent failure at physical therapy and epidural injections, fusion surgery, continued "significant and often incapacitating" symptoms post-surgery, and his recommendation for implantation of a dorsal column stimulator.   (Tr. 321).   He opined in the letter that, due to her "significant limitations with lifting, pushing or pulling, and [ ] exacerbation of pain with prolonged sitting and standing" she would not be able to return to her former job and he was recommending disability.   (*Id.*).   In the second opinion, which was an off-work note written October 2, 2009, Dr. Rapp stated that Simpson had been unable to work "in any capacity" since October 2008 and issued no specific date for her return.   (Tr. 426).

The ALJ discounted these opinions for two reasons.   First, he found that Dr. Rapp's opinion that Simpson was disabled was a determination reserved exclusively for the Commissioner.   (Tr. 57).   Second, he stated that "Dr. Rapp neglected to reconcile his conclusions with the clinical findings contained in the claimant's records."   (*Id.*).   The ALJ cites Simpson's negative December 2009 EMG, findings that she had a normal gait and full motor strength in her legs, two negative straight leg raising tests in March and April 2010, and CT scans of her fusion site that showed no evidence "typically associated with a disabling back impairment, such as significant central canal stenosis or nerve root impingement."   (*Id.*).   In addition, the ALJ

23

concluded that Dr. Rapp's failure to render a specific assessment of Simpson's physical capabilities made his opinion suspect, because it was thus unclear whether his opinions were based on objective medical evidence or solely on Simpson's subjective complaints. (*Id.*). It should be noted that there is no RFC assessment by any physician, treating or otherwise, in the present record.[3]

The ALJ properly found that the ultimate disability determination is reserved solely to the Commissioner. However, he erred with respect to his second rationale for discounting Dr. Rapp's opinions. As discussed in more detail below, the ALJ failed to properly consider the record as a whole, and improperly substituted his own medical opinion for that of Simpson's doctors, the latter of which were supported by overwhelming evidence.

An ALJ must give a treating physician's opinion controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) *quoting* 20 C.F.R. § 404.1527(d)(2). If an ALJ declines to give a treating physician's opinion controlling weight, she must then determine how much weight to give the opinion, "by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) *citing Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(2). The ALJ must give good reasons, supported by substantial evidence in the record, for the ultimate

---

[3] While the ALJ did discuss the RFC assessment of disability examiner Bunch, he properly concluded that he could not give it "any evidentiary weight, per the policies and procedures of the Social Security Administration." (Tr. 54). He did, however, find Bunch's RFC assessment "to be a useful synthesis of the medical evidence then contained in the claimant's record. (*Id.*).

weight given to a treating source opinion.  *Id.*, *citing Soc. Sec. Rul.* 96-2p, 1996 SSR LEXIS 9 at *12, 1996 WL 374188 at *5.  An ALJ is not required to give any special weight to a treating source's conclusion that a claimant is disabled, as this conclusion is reserved to the Commissioner alone, based on all the evidence of record.  20 C.F. R. § 404.1527(e)(1), (e)(3).

It should first be noted that some of the records the ALJ cites as contradicting Dr. Rapp's opinions are actually dated *after* those opinions were rendered.  (*See* Tr. 444-45; 440).  Thus, the ALJ erred to the extent he rejected Dr. Rapp's opinions on the basis that he failed to "reconcile his conclusion" with these subsequently-dated clinical findings.  (Tr. 52).

Furthermore, the evidence the ALJ points to as contradicting Dr. Rapp's opinions, including the evidence obtained after Dr. Rapp's opinions were rendered, when viewed in context, actually supports rather than detracts from his opinions.  As the Administration has recognized, pain is "the individual's own description of the effects of a physical . . . impairment," and "because symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, careful consideration must be given to any available information about symptoms."  SSR 95-5p, 1995 SSR LEXIS 11 at *3-4.  The ALJ determined that Simpson's allegations of disabling pain were negated by the clinical findings in the record.  However, while the few selective pieces of evidence the ALJ discussed are consistent with his own interpretation of the medical data, numerous records which he did not discuss (including other portions of the same records cited by the ALJ), clearly support Simpson's claims of disabling pain.

For example, the ALJ relied on CT scans showing that Simpson's hardware was well-placed and her disc spaces well-preserved, to support his self-drawn conclusion that such results do not comport with "debilitating back impairment such as significant central canal stenosis or

nerve root impingement."  (Tr. 57).  However, this is simply the ALJ's interpretation of the raw medical data and it directly conflicts with Dr. Rapp's conclusion that, despite the CT scans and Simpson's apparent lack of "focal, motor or sensory deficits," she still suffered from "complex regional pain syndrome" and "failed back syndrome," subsequent to a "failed lumbar fusion." (Tr. 429; 477).  Furthermore, based on this diagnosis, Dr. Rapp surgically implanted a dorsal column stimulator in Simpson's back, and surgically re-entered the site at least twice to readjust her leads when she complained that she was not receiving adequate pain coverage.  (Tr. 477; 423-24; 475-76; 446).  The ALJ erred in substituting his own medical conclusions for those of a treating physician as evidenced by the treating physician's subsequent diagnosis and treatment of the patient based on the same CT scans  *Sargent v. Comm'r of Soc. Sec.*, No. 09-13910m 2011 U.S. Dist. LEXIS 21276 at *17 (E.D. Mich. Feb. 11, 2011) *adopted by* 2011 U.S. Dist. LEXIS 21239 (E.D. Mich. March 3, 2011) (quoting *McCain v. Dir. Office of Workers Comp. Programs*, 58 Fed. Appx. 184, 193 (6th Cir. 2003) ("By independently reviewing and interpreting the laboratory reports the ALJ impermissibly substitute[s] his own judgment for that of a physician; an ALJ is not free to set his own expertise against that of a physician who presents competent evidence.").

In addition, other records the ALJ cites as contradicting Dr. Rapp's conclusions, when considered in context, actually support Simpson's allegations of disabling pain.  For instance, despite the negative EMG results, which the ALJ cites as undercutting Dr. Rapp's opinion and Simpson's credibility, Dr. Jennings still documented a loss of sensation in Simpson's right foot, still prescribed Neurontin (a nerve blocker), and even increased the dose when it was not effective.  (Tr. 449-50; 440-42; 455-56).  Similarly, despite finding a "normal gait" and "motor strength," Dr. Jennings also noted that Simpson's range of motion in her lumbar spine was

26

restricted and she was often tender to palpation.  While Dr. Rapp conceded the lack of focal and motor strength issues, he nevertheless found that Simpson suffered from "failed back syndrome." (Tr. 429; 440-43; 455-56).    Furthermore, based on Simpson's pain allegations and her examination, Dr. Jennings repeatedly prescribed her extremely potent narcotics in an attempt to relieve her pain, including extended-release morphine and Dilaudid, and noted only moderate success with either.  (Tr. 440-46; 455-56).   Although it is true that Dr. Jennings noted two negative straight leg raising tests in March and April 2010, these (plus one negative test performed by Dr. Rapp in October 2008, which was prior to Simpson's fusion surgery) are the only negative results in Simpson's entire file, as compared with at least ten positive tests, including one by Dr. Jennings, and one performed by a PT on the same day as Dr. Rapp's October 2008 test.  (Tr. 213-14; 222-23; 233; 279; 281; 325-26, 334; 434; 440-45; 455-56; 472). Furthermore, all of Simpson's treating doctors consistently noted the tenderness in her lumbar area upon palpation, and all documented restrictions on her range of motion.  (Tr. 213; 222-23; 232-33; 279; 325-26; 334; 337; 339 430; 432; 472; 429;  In short, much of the evidence the ALJ cites as contradicting Dr. Rapp's opinions does not do so, and its existence does not constitute a good reason for ascribing that doctor's opinions "scant weight."

Finally, the ALJ improperly rejected Dr. Rapp's opinions on the grounds that he did not render a functional assessment of Simpson's abilities which supposedly made it "unclear whether Dr. Rapp's conclusions are based on objective medical evidence or the claimant's subjective complaints."  (Tr. 57).  Dr. Rapp had personally examined and operated on Simpson over the course of two years prior to the date of the hearing, both before and after he rendered his opinions.[4]  From the content of Dr. Rapp's letter (although not the work-note), it is clear that his

---

[4] In addition, although after the date his opinions were rendered, he received progress notes from

opinion was not merely based on Simpson's subjective complaints but on his own observations during exams and surgery that he performed. (Tr. 321). Furthermore, there was no opinion rendered by any other physician, treating or consulting, that rejects Dr. Rapp's conclusion that Simpson's condition is debilitating. *See Horn v. Astrue*, 2011 U.S. Dist. LEXIS 100064, *23-34 (E.D. Tenn. Aug. 15, 2011) *adopted by* 2011 U.S. Dist. LEXIS 100182 (E.D. Tenn. Sept. 6, 2011) (finding error with ALJ's rejection of treating physician's opinion of disability where no other physician, treating or otherwise, had rendered an opinion on functional ability).

This case is factually similar to *Horn*. In *Horn*, just as here, the ALJ rejected the treating physician's opinion that the claimant was disabled based not on the opinion of another physician (there was none), but only on his selective reading of the underlying medical records (which ignored other portions of those records supporting the treating physician's opinion) and on his own interpretation of the clinical test results. *Id.* at *29-31. He then supported his conclusion to reject the treating physician's opinion by pointing to a lack of medical evidence, namely any other physician's imposition of work restrictions. *Id.* at *32. The court found that this was error for the same reasons this court finds error with the ALJ's decision-making in this case. *Id.* at *32-34; *see supra*.

In sum, consist with the decision in *Horn*, and based upon the evidence in the record, the court finds that the ALJ failed to provide "good" reasons for rejecting Dr. Rapp's opinions, 20 C.F.R. § 404.1527(d)(2), and that he therefore erred in the weight he gave those opinions.

### 2. Simpson's RFC Assessment

Because the ALJ erred in the weight given to Dr. Rapp's opinions, his RFC assessment, and thus his determination that Simpson was not disabled, are not supported by substantial

---

Dr. Jennings of Simpson's progress in pain management.

evidence.

The court recognizes that "the responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician," and that, while the "ALJ may not substitute his opinion for that of a physician, he is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009) (internal citations omitted). However, an ALJ must still support his RFC assessment with specific medical and other evidence in the record. *Barbera v. Astrue*, No. 11-13265, 2012 U.S. Dist. LEXIS 87401 at *48 (E.D. Mich. June 5, 2012) *adopted by* 2012 U.S. Dist. LEXIS 87388 (E.D. Mich. June 25, 2012) (citing SSR 96-8p, 1996 SSR LEXIS 5 at *19.

Here again, *Horn* is on point. Similar to *Horn*, the ALJ here specifically noted the lack of an RFC analysis by any of Simpson's treating physicians. (Tr. 56-57); s*ee Horn*, 2011 U.S. Dist. LEXIS 100064 at *32. He relied on this lack of evidence in making his own RFC determination, stating that Simpson's allegations of disabling pain were undercut "by a lack of clinical evidence illustrating the claimant's complete incapacity to sustain work-related activities of any kind." (Tr. 56). He stated that "there is presently no indication that the claimant has undergone a physical examination that examined [her] ability to perform a series of exertional, postural, and manipulative work-related activities." (*Id.*). He then went on find that Simpson could engage in the full range of sedentary work with lifting of no more than five pounds and a sit/stand option, and concluded that "there is currently insufficient clinical evidence to support the claimant's contention that she is unable to perform work-related activities in a manner consistent with the undersigned's conclusions." (*Id.*).

However, there is no logical connection between much of the evidence cited by the ALJ

and the limitations he determined were appropriate.  As detailed above, none of the clinical findings to which he points as support for his RFC assessment necessarily support the conclusion that Simpson was capable of performing the full range of sedentary work with lifting of five pounds and a sit/stand option.  Moreover and notably, none of Simpson's treating physicians interpreted those clinical findings in a manner consistent with the ALJ's interpretation.  For instance, Dr. Jennings prescribed Neurontin despite the negative EMG and Dr. Rapp implanted a dorsal column stimulator despite CT scans showing good hardware placement.

In addition, the ALJ selectively discussed Simpson's reports of activity in finding her capable of "personal care, tak[ing] care of her daughter's needs, mak[ing] the bed, prepar[ing] her meals, driv[ing] short distances, and manag[ing] her finances." (Tr. 56).  The ALJ's finding mischaracterized Simpson's true capabilities because he ignored her reports and her testimony that she could only do these things "on good days," and that she had approximately only 10 of those a month.  On the other days, she would simply move to the couch and lie on her stomach. (Tr. 21-33; 38; 155-57; 160).  Therefore, the court finds that the ALJ's RFC assessment is not supported by substantial evidence in the record.

### 3.    Remand *sua sponte*

The court recommends that this case be remanded back to the ALJ for further consideration in light of the foregoing. [5]  While Simpson has specifically requested only a reversal and immediate award of benefits, a court may *sua sponte* remand a case back to the ALJ under sentence four of 42 U.S.C. § 405(g) when appropriate.  *See Martin v. Comm'r of Soc. Sec.*, 61 Fed. Appx. 191 (Moore J., dissenting) (quoting *Iognia v. Califano*, 568 F.2d 1383, 1387 (D.C.

---

[5] Because the court recommends remand on the basis of the weight given to Dr. Rapp's opinions, it need not reach the issue of the ALJ's assessment of Simpson's credibility, although it notes that based on the foregoing, her credibility should be reassessed on remand.

Cir. 1977)) (noting that a court has the authority to remand a case under sentence four *sua sponte*); *Wenzlick v. Astrue*, No. 08-12414, 2009 U.S. Dist. LEXIS 77154 at *4-5 (E.D. Mich. Aug. 28,. 2009) (noting in *dicta* magistrate's *sua sponte* remand appropriate, though deciding the case on other grounds); *Lebron v. Barnhart*, 2007 U.S. Dist. LEXIS 33410 at *18-19 (S.D.N.Y. Apr. 26, 2007). This is because a district court reviewing an ALJ's decision on disability is "performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2nd. Cir. 1981).

The Sixth Circuit has held that in general "when an ALJ's factual findings are not supported by substantial evidence, 'the appropriate remedy is not to award benefits. The case can be remanded under sentence four of 42 U.S.C. § 405(g) for further consideration.' Only when 'all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits' should a court reverse an ALJ's decision and immediately award benefits." *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994) *quoting Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 175-76 (6th Cir. 1994). Here, the court finds that remand is appropriate because unresolved issues of fact remain on the present record, namely the extent of Simpson's functional abilities.

Accordingly the court recommends: (1) granting Simpson's request to reverse the ALJ's decision; (2) denying her request to enter an award of benefits; and (3) remanding the case back to the ALJ for further proceedings consistent with this Report and Recommendation. On remand, the ALJ should be required to order a consultative examination or re-contact Simpson's treating physicians in order to properly assess her functional limitations in light of the fact that the ALJ's decision specifically noted that the record did not include an RFC assessment by any physician, treating or otherwise. (Tr. 56). *See e.g. Shrewsbury v. Astrue*, No. 10-87, 2011 U.S. Dist. LEXIS 56743 at *13-15 (E.D.Tenn. April. 1, 2001) *adopted by* 2011 U.S. Dist. LEXIS

31

56624 (E.D. Tenn. May 26, 2011) (remanding for ALJ to order consulting examination where no treating or consulting physician evaluated functional limitations resulting from conditions that could reasonably be considered to cause severe pain).  Finally, the court recommends that the ALJ be ordered to consider the additional medical records that Simpson tendered to the Appeals Council, as well as any additional medical records she may have acquired since that time.

## III.   CONCLUSION

For the foregoing reasons, the court **RECOMMENDS GRANTING IN PART AND DENYING IN PART** Simpson's Motion for Summary Judgment **[10]**, **DENYING** the Commissioner's Motion **[13]**, and **REMANDING** this case back to the ALJ for further proceedings consistent with this Report and Recommendation.

Dated: July 19, 2012                         s/David R. Grand_____
Ann Arbor, Michigan                       DAVID R. GRAND
                                                       United States Magistrate Judge


### <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 19, 2012.

s/Felicia M. Moses_____
FELICIA M. MOSES
Case Manager
